## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

JOHN WALKER,                          )
                                      )
                   Plaintiff,         )     **CIVIL ACTION**
                                      )
v.                                    )     No.  09-1316-MLB
                                      )
THE BOARD OF COUNTY COMMISSIONERS     )
OF SEDGWICK COUNTY, et al.,           )
                                      )
                   Defendants.        )
_____)

### MEMORANDUM AND ORDER

This case comes before the court on defendants' motion for summary judgment.  (Doc. 168).  The motion has been fully briefed and is ripe for decision.  (Docs. 169, 184, 192).  Defendants' motion is granted in part and denied in part for the reasons herein.

**I.   Facts**[1]

Plaintiff John Walker was employed by defendant Comcare, a mental health center operated by defendant Sedgwick County, Kansas, from April 2005 until September 9, 2009.  Walker worked as a licensed master's level senior social worker (therapist) and provided counseling to clients.  Patricia Harris, Walker's co-worker, was an Advanced Registered Nurse Practitioner (ARNP) who prescribed medications to clients under the supervision of Comcare psychiatrists.

Walker met Harris in November 2006 to discuss a client who was in crisis.  At this time, Walker's office was on the second floor and Harris' office was on the first floor of the OPS building, Comcare's

_____

[1] Facts which are controverted are viewed in a light most favorable to plaintiff as the non-moving party.  Additional facts are discussed throughout the analysis section.

facility where employees provided outpatient services to clients. After the initial conversation between Harris and Walker, Harris began calling and emailing Walker.

On December 22, 2006, Harris went to Walker's office and began discussing Christmas. Walker wanted to leave work so that he could purchase a gift at Walgreen's. Harris informed Walker that her partner worked at Walgreen's and suggested that they could go to that store together. Harris wanted Walker to meet her partner. Walker agreed. They first stopped at a coffee house for about an hour and ordered drinks. Walker and Harris then drove to Walgreen's and spoke with Jennifer Clowers, Harris' partner. After purchasing an item, they left the Walgreen's store and Walker intended to drive Harris back to her car. Harris, however, asked if they could stop by Walker's home so that she could see his dog. Walker agreed. At Walker's home, Harris met the dog and Walker gave her a tour of his home. Harris wanted to remain at Walker's home to watch television but Walker told her that he plans that evening. Walker then drove Harris back to her vehicle.

In January 2007, Harris increased her visits to Walker's office, emails and phone calls. Harris sent four to five emails to Walker everyday and multiple phone calls. Harris also made multiple daily visits to his office. Harris would also stand by the front door at the office and wait for Walker to arrive. Towards the end of January, Harris' emails contained the following: "Hey, come smoke. Where are you. Why aren't you answering your phone. Are you avoiding me. Please give me a call." (Doc. 169, exh. 1 at 21). Walker would frequently be interrupted during his counseling sessions with calls

-2-

from Harris.  Walker also received three to four calls every evening on his home phone.  At the end of January, Walker told Harris that the phone calls needed to remain professional and that she must stop calling him at home.  He also asked her to refrain from sending him personal emails.

During the first week of February 2007, Harris relocated to an office across the hall from Walker due to an allergic reaction to a chemical on the first floor.  Harris made repeated visits to Walker's office and her actions were observed by several employees.  Walker spoke with Danielle Underwood about Harris' frequent visits and asked Underwood to come into his office when she observed Harris enter his office.  At this time, Dr. Lawrence Withrow, Walker's supervisor, was out of the office due to an illness.  After his return, Walker informed Withrow of Harris' repeated visits to his office.  Harris was also sending numerous emails and repeatedly calling Walker at the office and at home.

The emails sent by Harris include the following:

February 13: "Roberto, is everything ok?"[2]

February 13: "Roberto, I am going out in the cold to smoke in about 5 minutes."

February 13: "Roberto, are you avoiding me today?"

February 13: "John, is everything all right?"

February 14: "Roberto, how are you doing?"

February 21: "Are you in your office"

February 23: "Roberto, all I can ask is that you forgive me.  I

---

[2] Robert is Walker's middle name.

wish I had not told you how I felt and never caused all this mess."

February 23: "I have to take another Xanax."

February 25: "John, I'm setting [sic] in here wishing I was someone that you would want me to be but I don't [sic] who that person would be.  I call you because I'm so scared of losing you and I don't know what to do about that either. . . . I will always care about you and nothing or no one will ever change that for me.  I love you . . . I never thought I would say that to anyone. . . ."

March 5: "Hope you are doing well.  I have been worried about you."

March 23: "Are you talking to me today?"

March 23: "John, are you not going to smoke with me anymore?"

March 27: "John, I really need a friend to talk to (male point of view) about something that happened and was wondering if you would be willing to give me a few minutes and offer me some advice?" (Doc. 169, exh. 12).

Walker also received flowers and chocolates from Harris on Valentine's day.  On February 23, Harris told Walker that she wanted to date him.  Walker informed Harris that she needed to abide by the boundaries he set and that they keep their relationship professional. Harris became agitated and raised her voice to Walker.  Later that day, Harris emailed Walker and told him that she was going to take another Xanax.  Walker and other employees observed that Harris was stumbling in the hallways and did not appear to be sober.  Judy Addison, the program director, and Dr. Rex Lear, the medical director, spoke with Harris and told her to take medical leave for a few days

-4-

until she was stable on her medications.[3]

On February 26, a Sunday, Walker was working in the evening. Harris was on medical leave but came into the building at 6:30 p.m. to speak with Walker about his failure to respond to her repeated emails. Walker informed Harris that he did not want to talk about it. Harris again confronted Walker about his refusal to enter into a relationship with her. Harris stated that a friend believed that Walker is gay. Harris refused to leave Walker's office. Walker told her that he was leaving because he was uncomfortable. Harris then told Walker that she would leave, Harris screamed "Fuck you" as she was walking down the hall and then Harris slammed the office door. Walker locked his door and waited until he believed Harris had left the parking lot. When Walker arrived at the parking lot, Harris was in her vehicle which was parked next to Walker's vehicle. Harris had her door open and was crying. Walker returned to the building and encountered Dr. Brewer, a staff psychiatrist. Walker asked Brewer if any physicians were in the building. Brewer said that she was the only one in the building. Walker did not report the incident to Brewer because she was not a supervisor.

On February 27, Harris made several attempts to speak with Walker and she left a gift for Walker with another employee. On February 28, Walker reported the incident that occurred on February 26 to Addison. Walker informed Addison what occurred on the 26th and that he was being pursued by Harris and was not reciprocating Harris' feelings. Harris continued to call and email Walker during March and April. In

---

[3] Harris' mental health provider had prescribed the Xanax.

late March, Harris told Walker that she was dating someone else and wanted to regain their prior friendship.

In March and April, Harris began parking her vehicle next to Walker's vehicle. Harris and Walker also had several disagreements about treatment for their shared clients. With respect to one client, Harris told Walker that he had misdiagnosed a client and told the client that Walker was not qualified to review medical charts. The emails which occurred in May, July and August focus on client care and disagreements about their care.

On July 25, there was a staffing at Comcare to address the disagreements between Walker and Harris concerning the clients. During the staffing, Harris was upset and raised her voice. Dr. Withrow attempted to de-escalate Harris but was not successful. Harris glared at Walker throughout the staffing. Ultimately, Harris left the staffing prior to any resolution. Walker then filed a complaint with human resources stating that he had been sexually harassed and that he feared for his safety. Harris was immediately suspended during the investigation which was to be completed by Dorsha Kirksey, the Diversity and Employee Relations Manager for Sedgwick County.

On August 1, Walker petitioned for a protection from stalking order in Sedgwick County District Court upon recommendation from Addison. The court issued a temporary ex parte order restraining Harris from contacting or harassing Walker in any way.

At the conclusion of Sedgwick County's investigation, Kirksey issued a report in which she found that Harris' actions were "grossly inappropriate [and] completely unprofessional" but that Harris did not

sexually harass Walker.  Harris received a three day suspension and ultimately returned to work on September 26.  Upon her return, Walker requested that Comcare accommodate his protection from stalking order by allowing him to work in a different building.  Comcare allowed Walker to move into the CSS building, which was approximately one block away from his prior location.  All of the clients Harris had shared with Walker were transferred to other medical staff.

From October 9 to December 21, Walker was on FMLA leave.  On December 13, the court held a hearing on the petition from stalking. After the conclusion of the hearing, at which both Walker and Dr. Withrow testified, Harris agreed to the entry of the protection from stalking order which required Harris to not come within 500 feet of Walker and not attend lunch meetings in Walker's office building. Harris was also ordered to refrain from calling, contacting, following or harassing Walker.  Walker was told that he could return to his previous office or remain in the CSS building.  Walker chose to remain in the CSS building due to the fact that Harris continued to be employed in the OPS building, where outpatient services are provided. The transfer to the CSS clinic resulted in Walker having to work with clients who needed a "highly slowed down therapy approach" which is not an easy "task for [those] who do therapy in a rehabilitation program." (Doc. 184, exh. 32 at 9).

Walker's new office was not equipped with a computer, printer and phone access until February 2008.  Walker therefore had difficulty performing his job in the CSS building.  In May 2008, Harris was found in contempt of the protection from stalking order after parking her vehicle in the CSS parking lot and having lunch in the CSS building

with her supervisor.  Harris and Walker, however, did not have any communication during these violations.

On October 3, 2008, Walker's work performance was evaluated by his new supervisor, Cheryl Runyan.  Walker's productivity rate was determined to be at 45% for billed hours during the period of February through October.  Comcare requires a productivity rate of 84%.  During the period of November 2006 to October 2007, however, Walker's productivity was at a level of 99.1%.  The period of October 2007 to February 2008 was not reviewed due to Walker's FMLA leave and transfer to the CSS building.

Walker was placed on a performance improvement plan (PIP) for six months beginning October 2008.  Walker documented that the reduction of hours was a result of "therapy referrals of clientele either inappropriate for therapy services or not wishing to participate in therapy services, limited clientele access and significant client no-shows and cancellations of clientele assigned." (Doc. 184, exh. 32 at 14).  In the 2008 evaluation, the supervisor noted that the no-shows and cancellations occurred in 39% of Walker's scheduled sessions.  Also, the supervisor noted that even if Walker would have had a 100% attendance rate, his productivity rate would have been 72%.

On April 28, 2009, Walker's productivity rate declined and his PIP was extended to the end of August 2009.  Walker's productivity rate continued to decline in May (24%), June (19%), July (21%) and August (12%).  However, Walker had a significantly lower number of assigned patients than the other therapists.  (Doc. 169, exh. 28). For example, in July 2009, Walker had only 18 patients assigned to his caseload.  The other therapists were assigned the following number of

patients for July 2009: 44, 48, 59, 60, 63, 77. Those therapists had the following productivity rates for the same month: 55%, 94%, 88%, 60%, 94%, 60%. Also, Walker's scheduled appointments had a 49% rate of cancellations and no shows.

On September 9, 2009, Walker was terminated by Marilyn Cook, Comcare's executive director. Walker was informed that his termination was due to his failure to meet the productivity requirements. The termination letter states the following:

> Mr. Walker was expected to deliver approximately 77 hours per month for a six month period, for a total of 464 hours. During the time period November 2008 to April 2009, Mr. Walker delivered 174.75 hours of service. At the end of April, Mr. Walker was notified that he had not met the expectations of his PIP for the six month period. In an effort to assist Mr. Walker in being successful, he was notified that his PIP was being extended through August 2009 again with the expectation that he deliver a minimum of approximately 77 hours per month. During the five month period between April and August, Mr. Walker delivered 97.50 hours while the expectation was to deliver at least 387 hours. During both of the PIP periods Mr. Walker routinely failed to schedule 18 hours of appointments and often scheduled less than 12 hours per week.

(Doc. 184, exh. 22).

Walker filed this action against defendants on October 13, 2009, alleging claims of sexual harassment and retaliation. In May 2010, Cook filed a complaint with the BSRB against Walker. Cook believed that Walker had violated HIPAA after disclosing certain tape recordings of client sessions to his retained counsel. The complaint was dismissed by the BSRB in February 2011.

Walker amended his complaint on December 14, to include a claim of gender discrimination. Defendants move for summary judgment on all claims.

II. **Summary Judgment Standards**

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim.  Adamson v. Multi Community Diversified Svcs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III. Analysis

### A.   Gender Discrimination

Walker contends Comcare failed to accommodate his requests to be moved to a different location, placed him in a less desirable position, placed him on probation and terminated his employment because of his gender in violation of Title VII.[4] A traditional prima

---

[4] Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

facie case of gender discrimination requires sufficient circumstantial evidence to show: "(1) [plaintiff] is a member of a protected class, (2) [plaintiff] suffered an adverse employment action, (3) [plaintiff] was qualified for [his job], and (4) [plaintiff] was treated less favorably than others not in the protected class." Turner v. Pub. Serv. Co. of Colo., 563 F.3d 1136, 1142 (10th Cir. 2009). As a member of a historically favored group, however, Walker may not rely on the traditional factors to establish a prima facie case by way of circumstantial evidence, unless, "in lieu of showing that he belongs to a protected group, [he] establish[es] background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." Notari v. Denver Water Dep't., 971 F.2d 585, 589 (10th Cir. 1992). In the alternative, Walker may rely on direct evidence of discrimination. Id. at 590. Walker argues he presented both circumstantial evidence and direct evidence.

<u>Direct Evidence</u>

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." Hall v. U.S. Dep't of Labor, 476 F.3d 847, 855 (10th Cir. 2007). Stated differently, "[d]irect evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." Danville v. Regional Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002). In contrast, "[s]tatements of personal opinion, even when reflecting personal bias or prejudice, do not constitute direct evidence of

---

of such individual's race, color, religion, sex, or national origin."

-11-

discrimination, but at most, are only circumstantial evidence of discrimination because the trier of fact must infer discriminatory intent from such statements." <u>Hall</u>, 476 F.3d at 855.

Walker asserts the following constitute direct evidence of gender discrimination: 1) Comcare provides disparate support for female employees in protection from stalking proceedings and complaints; 2) Comcare provides disparate support for sexual harassment complaints against males; 3) positions at Comcare which are vacated by males are filled with females; 4) accommodations were made for a female therapist practicing offsite; and, 5) male co-workers were terminated after testifying on behalf of Walker and a female co-worker was only disciplined. (Doc. 184 at 29).

Walker's claims of disparate treatment do not amount to direct evidence of gender discrimination. <u>See</u> <u>Mathews v. Denver Newspaper Agency LLP</u>, 649 F.3d 1199, 1208 (10th Cir. 2011)(evidence that plaintiff was treated more harshly than similarly situated peers is indirect evidence). To prevail in a direct evidence case "a plaintiff must introduce direct or circumstantial evidence that the alleged [discriminatory or] retaliatory motive actually relate[s] to the question of discrimination in the particular employment decision, not to the mere existence of other, potentially unrelated forms of discrimination in the workplace." <u>Medlock v. Ortho Biotech, Inc.</u>, 164 F.3d 545, 549-50 (10th Cir. 1999)(internal citation omitted).

Walker has not established a direct link between the treatment of female co-workers and his adverse employment decisions. Moreover, Walker has not produced any evidence of context in these situations in order to determine if there is temporal proximity to his adverse

-12-

employment decisions.  <u>Riggs v. AirTran Airways, Inc.</u>, 497 F.3d 1108, 1117-18 (10th Cir. 2007).  Because Walker has not offered a context of the similarly situated individuals and the time period in which these events occurred, the finder of fact must draw an inference in order to determine that the adverse employment actions were motivated by Walker's gender.  "[E]vidence is not 'direct' if an inference of discrimination is required."  <u>Id.</u>

Therefore, Walker has not produced sufficient direct evidence of discrimination to withstand summary judgment.

<u>Circumstantial Evidence</u>

Without direct evidence of gender discrimination, Walker's claim must rely on circumstantial evidence and proceed under the <u>McDonnell Douglas</u>[5] burden-shifting framework.  Pursuant to the <u>McDonnell Douglas</u> decision, the following three steps are required for evaluating Title VII disparate treatment claims:

First, plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if plaintiff succeeds in proving the prima facie case, the burden shifts to defendants "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Third, should defendant carry this burden, plaintiff must then have an opportunity to prove by preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

As discussed previously, Walker must meet his prima facie burden

---

[5] 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973).

and also show that defendants are "unusual employers who discriminate against the majority." <u>Notari</u>, 971 F.2d at 589.   Walker's circumstantial evidence includes 1) disparate support for female employees in protection from stalking proceedings and complaints; 2) disparate support for sexual harassment; 3) positions vacated by males being filled with females; 4) accommodations provided to a female therapist practicing offsite; and, 5) male co-workers were terminated after testifying on behalf of Walker and a female co-worker was not.

First, Walker cites to the testimony of Bridget Siedler who sought a protection from stalking order from one of her clients at Comcare.   Siedler explains that she was offered a safety plan from Comcare and support in the form of male workers walking her to her vehicle after work.   However, unlike Walker's allegations against Harris, Siedler's experiences with her stalker were vastly different. Siedler's stalker was a client, not a co-worker.   Siedler's stalker threatened her over a period of several years.   Moreover, the stalker threatened her daughter and broke into her home.   Because Walker has not established that Siedler was similarly situated to him, the differential treatment by Comcare is not evidence that defendants are the unusual employer who discriminate against the majority.   <u>Durant v. MillerCoors, LLC</u>, No. 10-1246, 2011 WL 892783 (10th Cir. Mar. 16, 2011)(citing <u>McGowan v. City of Eufala</u>, 472 F.3d 736, 745 (10th Cir. 2006)).

Second, Walker asserts that Comcare handles sexual harassment complaints differently when a male asserts a sexual harassment claim against a female.   As evidence of this allegation, Walker cites to the

-14-

sexual harassment complaint against Dr. Withrow.[6]  This complaint, however, was made by Walker against Withrow.  It was not a complaint made by a female against a male.  Moreover, the complaint dealt with one statement which was contained in an email and was investigated by the same individual who handled Walker's complaint.  Walker has not established that this investigation was handled differently than his investigation.

Third, Walker cites to various male employees who separated from employment with Comcare and were replaced by females.  After reviewing the exhibits, however, the court cannot conclude that this is evidence of preferential treatment.  The exhibits show that several males <u>and</u> females separated from employment with Comcare.  They also show that both males and females were hired by Comcare.  In the absence of any background evidence of the hiring process, the court cannot conclude that this evidence supports a finding that defendants are the unusual employer that discriminates against males.

Fourth, Walker asserts that Sarah Harkness was granted dual-program practice accommodations but that he was denied those same requests.  However, Walker provides no additional evidence regarding the similarities between him and Harkness.  The court has no knowledge of her supervisors, caseload, clientele, or any other information which would establish that Walker and Harkness are similarly situated.  "Work histories, company policies applicable to the plaintiff and the

---

[6] Walker also cites to testimony by Joan Tammany.  (Doc. 184 at 29).  Walker, however, does not specify the content of Tammany's testimony.  The court has reviewed the testimony and it does not support a finding that sexual harassment claims by females are treated differently at Comcare.

-15-

comparator[s], and other relevant employment circumstances should be considered when determining whether employees are similarly situated." Green v. New Mexico, 420 F.3d 1189, 1194 (10th Cir. 2005). Without information to establish that Walker and Harkness were similarly situated, the court cannot determine that Harkness' ability to see both types of patients is evidence that defendants are discriminating on the basis of gender. See Durant, 2011 WL 892783 (citing McGowan, 472 F.3d at 745).

Finally, Walker contends that two male co-workers, Withrow and Camarena, were fired after providing favorable deposition testimony in this case and the one female witness, Harkness, was only disciplined. Withrow and Camarena, however, have been terminated because of their alleged inability to meet the productivity requirements and not due to their involvement in this case. This court would have to make inference on inference in order to find that their terminations were the result of their involvement in this case. Stacking inferences cannot be the basis of a finding that defendants are the unusual employer who discriminates against the majority.

Because Walker cannot provide background evidence, his only other method of establishing a prima facie case of discrimination is by offering evidence that shows it is reasonably likely he would not have been fired or suffered adverse employment actions "but for" the defendant's discrimination. Notari, 971 F.2d 585, 590 (10th Cir. 1992). It is not enough for Walker to show he was treated differently than another similarly situated employee, but Walker "must allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for plaintiff's status the

challenged decision would not have occurred." Id.

Walker has not attempted to satisfy the but for standard in his motion nor does the evidence submitted by Walker establish that the adverse actions were taken because of his gender. Therefore, defendants' motion for summary judgment on Walker's claim of gender discrimination is granted.

**B.    Sexual Harassment**

Walker may establish a violation of Title VII by proving that discrimination based on sex created a "hostile or abusive work environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S. Ct. 2399, 91 L. Ed.2d 49 (1986). To establish a prima facie claim for hostile work environment under Title VII, Walker must show (1) that he is a member of a protected class; (2) that the conduct in question was unwelcome; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) a basis for imputing liability to the employer. Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007). To prevail under a hostile work environment theory, Walker must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with his work performance or created an intimidating, hostile or offensive working environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed.2d 295 (1993), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753, 118 S. Ct. 2257, 141 L. Ed.2d 633 (1998). To establish this claim, Walker must show both that the conduct to which he was subjected was "severe or pervasive enough to create ... an environment that a reasonable person would find hostile or

abusive," and that he "subjectively perceive[d] the environment to be abusive."  Harris, 510 U.S. at 21.  The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id.

Walker asserts that Harris sexually harassed him by (1) calling and emailing him several times a day; (2) visiting his office on several occasions; (3) buying him gifts; (4) stalking him at the office; (5) expressing her feelings for him and seeking out a personal relationship; (6) parking her car next to his car; and (7) making complaints about his treatment of patients.

Defendants first argue that because Walker is a male he must establish that defendants are the unusual employer who discriminate against the majority.  The court disagrees.  In Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 75 (1998), the Supreme Court held that "Title VII's prohibition of discrimination 'because of ... sex' protects men as well as women."  Therefore, Walker has met the first element as he is in a protected group.  The second element, that the conduct was unwelcome, is not in dispute.

To meet the third element of his claim, Walker must show that he was the object of harassment because of gender.  Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998).  The Supreme Court has set forth three evidentiary routes a plaintiff may utilize to prove that discrimination was based on sex: (1) explicit or implicit proposals of sexual activity motivated by sexual desire,

-18-

(2) harassment motivated by a general hostility toward members of one gender in the workplace or (3) comparative evidence about how Harris treated members of each sex in a mixed-sex workplace. <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, <u>supra</u>, 523 U.S. at 80-81. The only route that can be used in this case is the first route. There is no evidence that Harris was motivated by a general hostility toward males in the workplace or that Harris treated male co-workers at Comcare different than female co-workers.

The majority of the incidents Walker complains about are gender neutral. However, the evidence establishes that the incidents occurred because of Harris' desire to be in an intimate relationship with Walker. There is sufficient evidence to establish that Harris repeatedly asked Walker to enter into a romantic relationship with her. Harris also professed her love to Walker and numerous co-workers testified that Harris was romantically interested in Walker. Conduct motivated by sexual desire is sufficient to establish that the actions took place because of Walker's sex. <u>Dick v. Phone Directories Co., Inc.</u>, 397 F.3d 1256, 1264-65 (10th Cir. 2005). Therefore, the court finds that Walker has established a genuine dispute of material fact as to whether Harris' conduct was motivated by Walker's sex.

Turning to the fourth element, Walker must establish that Harris' conduct was sufficiently severe or pervasive to create an abusive working environment. Some factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 U.S. at 21. "Because frequency is merely

-19-

one factor in the analysis, an isolated incident may suffice if the conduct is severe and threatening." Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1243 (10th Cir. 2001).

The evidence in this case demonstrates that Harris was constant in her attempts to interact with Walker. Harris emailed and called Walker several times a day, including calls to his home phone in the evening. Harris repeatedly sought an intimate relationship with Walker even though he continued to tell her that he desired a professional relationship only. Harris frequently interrupted Walker while he was with his clients, entered his office and would not willingly leave, parked next to his car and waited for him to arrive at the office.

As a result of Harris' actions, Walker sought out a therapist, was diagnosed with depression, and could not work late in the day because he was fearful of Harris catching him in the office by himself. Walker also could not concentrate on his work because of the constant interruptions. Other co-workers have also testified about Harris' repeated calls and visits to Walker's office during the workday. Moreover, Walker sought out assistance from his co-workers and supervisors. Ultimately, Walker's therapist determined that Walker could not work in the same building as Harris because of Walker's mental health condition. Therefore, Walker has raised a genuine dispute as to whether Harris' conduct unreasonably interfered with his work performance. Harsco Corp. v. Renner, 475 F.3d 1179, 1187 (10th Cir. 2007); see also Roberts v. Air Capitol Plating, Inc., No. 95-1348, 1997 WL 446266, *15 (D. Kan. July 22, 1997)(material question of fact as to whether the conduct was so pervasive as to

alter the conditions of her employment and create an abusive working environment when harasser followed the plaintiff around work, made continuous calls, and went into the plaintiff's office two to three times a day).

Turning to the final element, Walker must show that Comcare had "actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." Holmes v. Utah, Dept. of Workforce Servs., 483 F.3d 1057, 1064 (10th Cir. 2007). There is evidence that Comcare was aware of previous complaints against Harris and thus should have been on notice of her harassing behavior.  Walker complained to Dr. Withrow and also complained to Addison in February 2007.  Comcare did not take any action, however, until after Walker made an additional complaint to Addison in July. Defendants assert that the delayed response by Comcare should not be dispositive because Harris' actions decreased in March.  This argument is not persuasive, however, in light of Walker's testimony of his continued fear and inability to accomplish his work and Harris' continued stalking in the months after February 2007.  Therefore, Walker has established that a genuine dispute of material fact exists as to whether Comcare had notice of the harassment.

Defendants' motion for summary judgment on Walker's sexual harassment claim is denied.

## C.  Retaliation

Title VII makes it an unlawful employment practice for an employer "to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter [.]" 42 U.S.C. § 2000e-3(a).  In order to establish a prima

facie case of retaliation, Walker must show (1) he engaged in protected opposition to discrimination; (2) defendants took an adverse employment action against him; and (3) a causal connection between the protected activity and the adverse action. <u>Jeffries v. Kansas</u>, 147 F.3d 1220, 1231 (10th Cir. 1998). Walker may maintain an action for retaliation even though the conduct forming the basis of his underlying complaint was not adjudged to have violated Title VII. <u>Id.</u> "Once the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. If the employer does so, the burden shifts back to the plaintiff to show that the employer's reasons are pretextual." <u>McGowan v. City of Eufala</u>, 472 F.3d 736, 741 (10th Cir. 2006).

It is undisputed that Walker has satisfied the first prong of his prima facie case. <u>See Hertz v. Luzenac America, Inc.</u>, 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."). The parties dispute, however, whether the alleged retaliatory acts constitute adverse employment actions and whether they are the result of Walker's complaints.[7] "A challenged employment action is adverse

---

[7] Defendants also assert that certain retaliation claims were waived because they were not preserved in the pretrial order. (Doc. 169 at 23). Presumably, defendants are asserting the claims are waived because the contentions in the pretrial order are not structured to identify which allegations refer specifically to which claim. This does not waive Walker's retaliation claims, however. Walker's contentions in the pretrial order adequately describe defendants' actions in changing his employment conditions, giving him negative evaluations and his allegedly illegal termination. Defendants have been on notice that these claims were part of Walker's retaliation claim.

for the purposes of a claim for retaliation under Title VII if a reasonable employee would have found it materially adverse. . . . [A]n employer's action is adverse under Title VII if it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." McGowan, 472 F.3d at 742 (internal quotations and citations omitted).

### Specific Retaliation Allegations

Walker's response cites more than twenty fact paragraphs in summary form which are alleged to constitute retaliation acts.  The court "will not manufacture arguments [for Walker], and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented." Craven v. Univ. of Colo. Hosp. Auth., 260 F.3d 1218, 1226 (10th Cir. 2001).  The court will address the adverse actions discussed by defendants and then turn to the allegations in the pretrial order.

### 1.  Harris' Actions

Defendants assert that the retaliation allegations by Harris are not actionable because Harris was not Walker's supervisor.  "An employer may not be held liable for the retaliatory acts of co-workers if none of its supervisory or management-level personnel orchestrated, condoned, or encouraged the co-workers' actions, and no such management participation could occur if the supervisory or management-level personnel did not actually know of the co-workers' retaliation." Gunnell v. Utah Valley State College, 152 F.3d 1253, 1265 (10th Cir. 1998).  Walker has not established that Harris' actions in disagreeing with client treatment and Harris' improper discussions of Walker's competency with clients were orchestrated,

condoned or encouraged by a supervisory employee at Comcare. Therefore, Walker's allegations pertaining to Harris' retaliation through clients cannot survive summary judgment.

### 2.   BSRB Complaint

Next, Walker contends that Marilyn Cook filed a complaint with the Behavioral Sciences Regulatory Board (BSRB) in retaliation of Walker's ongoing lawsuit.  On January 27, 2010, Walker filed a fourth EEOC charge which alleged sexual harassment and retaliation against defendants.  During the discovery phase of this case, Walker disclosed recordings to his attorney which were allegedly done during therapy sessions.  Defendants learned about these recordings and Marilyn Cook filed an ethical complaint with the BSRB against Walker for disclosing the recordings of therapy sessions in May 2010.

Defendants contend that the second element of Walker's retaliation claim is not met because the ethics complaint was not an adverse action.  The Tenth Circuit has instructed that the phrase adverse action is to be liberally defined and include acts "that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." Annett v. Univ. of Kansas, 371 F.3d 1233, 1239 (10th Cir. 2004).  While Walker's ethics investigation resulted in a dismissal, the court finds that an ethics investigation for a licensed individual may result in damage to reputation and potentially harm future employment prospects. Therefore, there is a genuine dispute of material fact as to whether the ethics complaint was an adverse action.

Next, Walker must show that a casual connection exists between his protected activity, filing an EEOC charge, and the ethics

complaint.   Walker cannot establish causation, however, on temporal proximity alone because the Tenth Circuit has held that four months is too large a time gap to establish a causal connection.  <u>Proctor v. United Parcel Serv.</u>, 502 F.3d 1200, 1208 (10th Cir. 2007).  Because the adverse action was not closely connected, Walker must rely on additional evidence to establish causation.  <u>E.E.O.C. v. C.R. England, Inc.</u>, 644 F.3d 1028, 1052 (10th Cir. 2011).  Walker has not offered any additional evidence to show that the filing of the ethics complaint was in retaliation of Walker's EEOC charge.

Moreover, defendants have offered a legitimate nondiscriminatory reason for filing the complaint.  Cook testified that she was instructed to file the complaint after speaking with an individual from the BSRB.  The burden now shifts to Walker who must show that defendants' proffered reason was mere pretext.  <u>Proctor</u>, 502 F.3d at 1208.  Walker can meet this burden "by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  <u>C.R. England, Inc.</u>, 644 F.3d 1028 at 1052.  Walker has not done so.

Walker's allegations of pretext consist of arbitrary and subjective use of productivity numbers and the firing of co-workers. Those allegations have not been linked to Cook's ethics complaint. The productivity numbers concerning Walker occurred while he was employed by Comcare in 2008 and 2009.  Cook's complaint was filed in May 2010.  Moreover, the terminations of Walker's co-workers also fail

-25-

to support a finding of pretext.  Withrow was terminated in January 2008, again prior to Cook's complaint.  Camarena was terminated in November 2011, more than 18 months after the ethics complaint was filed.  Walker has failed to show that defendants' legitimate reason for filing the ethics complaint was pretext for discrimination.

Therefore, defendants' motion for summary judgment on this claim is granted.

### 3.   Hours of Supervision Reported

Next, Walker contends that defendants retaliated against him by Cheryl Runyan's failure to correct the amount of hours Walker had worked under Runyan's supervision.  The facts show that Walker initially made a mistake calculating the hours for his application to sit for the licensing exam.  Walker was notified by the BSRB of the lack of the necessary hours.  Walker realized his mistake and contacted Runyan to send in a corrected form in mid-June 2010.  Runyan did not do so.  Instead of contacting the BSRB, Runyan contacted Cook who advised her not to respond to the BSRB and stated that the attorney would do so.  Ultimately, after several repeated contacts by Walker and the BSRB, Runyan completed the additional form in early September.  As a result, Walker could not sit for his licensing exam for an additional three months.

Because this delay resulted in Walker's inability to obtain his license for an additional three months, the court finds that Walker has established a genuine material fact exists as to whether the action was adverse.  The court now turns to the causation requirement. On June 1, 2010, Walker had filed his fourth charge with the EEOC pertaining to Cook's ethical complaint against him.  Therefore, Walker

has established the causation element because Walker's EEOC charge was filed a few short weeks prior to Runyan's failure to respond to the requests for the correction form.

Because Walker has met his prima facie case of retaliation with respect to this adverse action, the court now turns to defendants to provide a legitimate nondiscriminatory reason for the action. Defendants, however, have not provided a reason for Runyan's failure to provide the correct hours to the BSRB. Therefore, defendants' motion for summary judgment on this claim is denied.

### 4.  Transfer to CSS

Walker next alleges that his transfer to the CSS building and the delay in office equipment was an adverse employment action. In Burlington N. & Sante Fe Ry. v. White, the Supreme Court found that an employee involuntarily transferred to a less desirable position had stated a material adverse employment action under Title VII, even though the duties of both positions were similar. 126 S. Ct. 2405, 2416-18 (2006). The Burlington Northern Court noted, however, that "reassignment of job duties is not automatically actionable." 126 S. Ct. at 2417. The Tenth Circuit, in a case decided after the Burlington Northern decision, has stated:

> After Burlington Northern we have continued to examine claims of adverse action through a case-by case approach, examining the unique factors relevant to the situation at hand. The materiality of a claimed adverse action is to be determined objectively; petty slights, minor annoyances, and simple lack of good manners will not deter a reasonable worker from making or supporting a charge of discrimination. . . . Even prior to Burlington Northern, we found adverse action if it constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with

> significantly different job responsibilities, or
> a decision causing a significant change in
> benefits.

McGowan, 472 F.3d at 742 (internal quotations and citations omitted).

Taking the facts in the light most favorable to Walker, Walker has created a genuine issue of material fact with respect to this element. Walker alleges the therapy practice in the CSS building is not as desirable as it is in outpatient services. Moreover, Walker lost his outpatient clients in the transfer which resulted in fewer patients and his inability to meet the productivity requirements. In addition, Dr. Withrow testified that the position in CSS is less favorable and the clients are dealing with significantly different issues, such as bathing, in contrast to the clients in the outpatient therapy who are dealing with interpersonal issues. Walker's supervisor also commented that the transition to the CSS services is "not easy" for a therapist who had previously provided outpatient services. Moreover, Walker's arrival at the new building caused several difficulties for Walker as he was not supplied with the basic equipment which was necessary for Walker to perform his job. That equipment was not provided for more than two months.

Applying the standards articulated above, an objective view of Walker's alleged facts show that Walker has established a genuine issue of material fact with respect to this element. See also Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1214-15 (10th Cir. 2003) (finding a transfer materially adverse when, although the plaintiff retained the same rate of pay, her job duties and responsibilities "dramatically" changed).

Walker has also established the causation element because the

-28-

transfer occurred immediately after his internal complaint of sexual harassment.  <u>O'Neal</u>, 237 F.3d at 1253.  Again, defendants have failed to offer a legitimate nondiscriminatory reason for this action.

Therefore, defendants' motion for summary judgment on this claim is denied.

**5.   Performance Reviews and Termination**

Finally, Walker contends that Comcare retaliated against him by issuing negative performance reviews and terminating his employment. The time sequence of events that led up to Walker's termination were as follows:

April 11, 2008: Walker filed an amended charge of sexual harassment and retaliation with the EEOC.

May 6, 2008: Walker filed an amended charge of disability discrimination with the EEOC.

October 3, 2008: Walker received a negative evaluation and was placed on PIP status.

November 20, 2008: Harris was found guilty of contempt of the protection from stalking order and sentenced to 48 hours in jail.

December 13, 2008: The final protection from stalking order was extended for an additional twelve months.

February 20, 2009: Walker filed a third charge of sexual harassment and retaliation with the EEOC.

April 30, 2009: Walker was given a negative evaluation and continued on PIP status for an additional six months.

September 9, 2009: Walker was terminated for failing to comply with productivity standards.

Again, the first element of retaliation is not in dispute as

-29-

Walker had undisputedly filed charges with the EEOC prior to the negative evaluations and termination. As to the second element, a termination is an adverse employment action. <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998). A negative evaluation which results in a termination is also considered an adverse action. <u>Toth v. Gates Rubber Co.</u>, No. 99-1017, 2000 WL 796068 at *9, (10th Cir. June 21, 2000).

The last element requires that Walker establish a causal connection between the protected activity and the negative evaluations and ultimate termination. Five months elapsed between Walker's EEOC charge and the first negative evaluation which is too large a gap to make a presumption of retaliation. However, only two months elapsed between Walker's third EEOC charge and his second negative evaluation. This time period is short enough for the court to presume retaliation. Walker's termination occurred seven months after his third EEOC charge which is again too large a gap to presume retaliation. Walker must therefore rely on additional evidence to establish causation for his first negative evaluation and his termination. <u>E.E.O.C. v. C.R. England, Inc.</u>, 644 F.3d 1028, 1052 (10th Cir. 2011).

As additional evidence, Walker has produced the testimony of Withrow and Camarena. Camarena was terminated in November 2011 for failing to comply with productivity standards. Camarena testified, however, that he failed to comply with the standards during 2005, 2006, 2007, 2008, and 2009. During these years, Camarena was only placed on a PIP for three years but Camarena's supervisor used subjective considerations to support a finding that he had complied with the PIP. Withrow testified that a management level employee

-30-

stated during a meeting that the productivity requirement was a tool that management could use as a basis to terminate employees. Moreover, Walker repeatedly complained that he did not have enough clients to meet the productivity standard. This additional evidence is sufficient to establish a genuine dispute of material fact as to whether Walker was issued negative evaluations and terminated in retaliation for filing charges with the EEOC.

The burden now shifts to defendants to provide a legitimate nondiscriminatory reason for the adverse actions. Defendants assert that Walker's performance justified the issuance of the negative performance reviews and that Walker's failure to achieve the productivity levels warranted his termination. Defendants have met their burden in providing a legitimate nondiscriminatory reason for their actions.

Walker must now show that defendants proffered reason was mere pretext. Proctor, 502 F.3d at 1208. Walker can meet this burden "by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." C.R. England, Inc., 644 F.3d 1028 at 1052.

The testimony by Withrow, one of Walker's supervisors, and Camarena demonstrate that the productivity levels were very subjective and arguably used as a tool to terminate employees. Camarena worked as a therapist at the CSS building and provided therapy to the same clientele as Walker during 2008 to 2009. Camarena failed to meet the

productivity requirements for five continuous years but he was not terminated.  Walker was terminated by Cook, the director of Comcare, after a review of Walker's PIP by Karen McNally, the program director at CSS during both Camarena and Walker's employment.  McNally ultimately recommended termination of Camarena to Cook in 2011 even though Camarena did meet the productivity standards in 2010.  Walker has submitted sufficient evidence at this time to support a finding that Walker and Camarena were similarly situated.  See Green v. New Mexico, 420 F.3d 1189, 1194 (10th Cir. 2005)(a "similarly situated employee is one who deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline.")

Moreover, the productivity levels provided by defendants show that the majority of the therapists at Comcare do not meet productivity levels over a consistent period of time.  In addition, Comcare was aware that there was no possible way for Walker to meet his productivity level with the number of clients assigned to his caseload.  Therefore, Walker has demonstrated that there are weaknesses and contradictions in defendants' reasons for Walker's termination.

Defendants' motion for summary judgment on this claim is therefore denied.

## D. Comcare

Defendants move for summary judgment on all claims against Comcare on the basis that it is not a separate entity but only a department of Sedgwick County.  Walker did not respond to this argument.  Under Kansas law, subordinate governmental agencies do not have the capacity to sue or be sued unless a specific statue

-32-

authorizes such action.  Fugate v. Unified Gov't of Wyandotte
County/Kansas City, KS., 161 F. Supp.2d 1261, 1266 (D. Kan.
2001)(citing Mason v. Twenty-Sixth Judicial Dist., 670 F. Supp. 1528,
1535 (D. Kan. 1987) and Hopkins v. State, 237 Kan. 601, 702 P.2d 311,
317 (1985)).

Therefore, Comcare's motion for summary judgment on all remaining
claims is granted.

**IV.  Conclusion**

Defendants' motion for summary judgment on Walker's claim of
gender discrimination is granted.  Defendants' motion for summary
judgment on Walker's claim of sexual harassment is denied.
Defendants' motion for summary judgment on Walker's claim of
retaliation is denied in part and granted in part.  (Doc. 168).
Comcare's motion for summary judgment on all claims is granted.

No motions to reconsider may be filed.  Fed. R. Civ. P. 1.

This case will be tried to a jury on June 19, 2012.  The court
will hold a status conference on June 4, 2012, at 1:30 p.m.


IT IS SO ORDERED.

Dated this   9th   day of April 2012, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE